# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| AMERICAN NATIONAL PROPERTY & CASUALTY COMPANY, | : <br> : <br> : Case No. 2:20-cv-00539-ALM-EPD |
| Plaintiff, | : |
| | : CHIEF JUDGE ALGENON L. MARBLEY |
| v. | : |
| | : MAGISTRATE JUDGE DEAVERS |
| MICHAEL WILLIAMSON, II, *et al.*, | : |
| | : |
| Defendants. | : |

## OPINION AND ORDER

This matter is before the Court on Plaintiff American National Property & Casualty Company ("ANPAC")'s Motion for Summary Judgment. (ECF No. 36). Defendants First Hotel Management, LLC and Halle's 5 Restaurants, LLC filed a response in opposition. (ECF No. 39). For the reasons set forth below, this Court **GRANTS** Plaintiff's Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background

#### 1. The Allen Properties

Non-party Gary Lee Allen built a family home in 1975 at 1577 Township Road 196 N.E. in Crooksville, Ohio. (ECF No. 36-1 ¶ 3; ECF No. 36-3 6:11–6:18). Mr. Allen has lived in this home with his wife since 1975 (ECF No. 36-3 6:16–6:23). Mr. Allen acquired the land that his home sits upon from his grandfather in 1975. (ECF No. 36-3 10:18–19, 11:15–12:11). The property line for the parcel upon which Mr. Allen's home sits crosses Township Road 196 N.E. (ECF No. 36-3 15:21–15:25). Between approximately 1975 and 1987, Mr. Allen and his wife acquired the parcels of land immediately north and south of his home. (ECF No. 36-3 12:12–

1

12:25). Beginning in 1987, Mr. Allen and his wife began to acquire tracts of land located across Township Road 196 N.E. from his home. (ECF No. 36-3 13:7–15:13). When Mr. Allen acquired the property at 1355 Township Road 196 N.E. in 2008, he had acquired all of the property immediately surrounding his home on both sides of Township Road 196 N.E. (ECF No. 36-3 15:11–15:13). Mr. Allen received a "whole fist full" of bills for the taxes owed on the various properties the Allens had acquired. (ECF No. 36-3 21:17–22).

A two-bedroom home is located at 1355 Township Road 196 N.E., the parcel immediately across Township Road 196 N.E. from Mr. Allen's home. (ECF No. 36-1 ¶ 6; ECF No. 36-3 16:1–16:5). His family refers to this property as 2018 Township Road. (ECF No. 36-1 ¶ 6; ECF No. 36-3 16:6–16:10). The house was built in approximately 1913 and has had a separate address since that time. (ECF No. 36-3 16:15–16:21). The home has a separate electrical meter. (ECF No. 36-3 21:2–21:6). The house is connected to gas via a well on the property. (ECF No. 36-3 20:10–20:20). Mr. Allen received bills for the real estate taxes for 2018 Township Road, which he and his wife paid. (ECF No. 36-3 21:11–22:1). A garage is located just south of the house, which Mr. Allen left vacant. (ECF No. 36-3 9:12–10:4, 19:10–19:17). Eventually the garage was converted into a habitable living space. (ECF No. 36-4 15:3–16:7).

After a few years of the property sitting vacant, Mr. Allen's daughter, Michelle, moved into the home at 2018 Township Road in November 2010. (ECF No. 36-1 ¶ 7; ECF No. 36-3 17:2–17:11; ECF No. 36-4 7:4–7:9). She moved into the property with her three children. (ECF No. 36-4 12:11–12:15). At one point, Mr. Allen requested that Michelle pay $300 per month in rent, but she never paid rent. (ECF No. 36-1 ¶ 7; ECF No. 36-3 18:22–19:1; ECF No. 36-4 17:11–17:21). Ms. Allen had separate electric and cable bills, which she paid. (ECF No. 36-4 18:1–18:10, 18:19–18:24). A water bill for the property was left in her parents' name, but was paid by Ms. Allen.

(ECF No. 36-4 18:11–18:18). Mr. Allen and his wife handled trash collection and fees for both properties. (ECF No. 36-4 19:18–20:5). Ms. Allen, and later both she and her husband, handled maintenance and upkeep of the home, including painting the home, installing a new hot water heater, and furnishing the home. (ECF No. 36-1 ¶ 7; ECF No. 36-3 24:20–25:18; ECF No. 36-4 25:8–25:20). Mr. Allen informed his daughter that she would be responsible for the cost of replacing the roof at 2018 Township Road. (ECF No. 36-1 ¶ 7). At some point, Ms. Allen acquired renter's insurance for the property but did not maintain coverage in 2018. (ECF No. 36-4 28:1– 28:17).

Ms. Allen then met the Defendant Michael Williamson, II and they entered into a romantic relationship. Mr. Williamson moved into 2018 Township Road in January 2013. (ECF No. 36-4 8:9–8:13). Ms. Allen and Mr. Williamson married in May 2013. (ECF No. 36-1 ¶¶ 5, 9; ECF No. 36-4 7:10–7:15). In August 2018, Mr. Williamson and Ms. Allen lived at 2018 Township Road with Ms. Allen's daughter. (ECF No. 36-3 8:22–9:10). Mr. Williamson never paid rent to the Allens. (ECF No. 36-3 10:16–10:20). Mr. Williamson would pay Ms. Allen for his portion of their utilities. (ECF No. 36-3 26:4–27:11). Mr. Allen does not possess keys to 2018 Township Road, does not store any property at the house, and has never stayed overnight at the house. (ECF No. 36-1 ¶ 8; ECF No. 36-3 22:10–23:3). According to Mr. Allen, Mr. Williamson only possesses keys to 2018 Township Road. (ECF No. 36-1 ¶ 10). Mr. Williamson and Mr. Allen have never "slept under the same roof," shared the cost of utilities, or shared storage space. (ECF No. 36-1 ¶ 10). Neither Mr. Williamson nor Mr. Allen have free access to the other's separate residence without permission. (ECF No. 36-1 ¶ 10). Mr. Allen visited the house at 2018 Township Road on occasion, primarily to see his grandchildren. (ECF No. 36-3 23:4–23:23). The grandchildren would visit his home frequently, but visits from his daughter were sparse. (*Id.*).

2.      The Insurance Policies

ANPAC has issued two insurance policies to Mr. Allen, which are now at the center of this litigation: the Farm Policy and the Umbrella Policy. Mr. Williamson has been receiving insurance coverage from ANPAC via the Barry Peters Agency since approximately 2011. (ECF No. 36-3 26:6–18).

*a.      The Farm Policy*

ANPAC issued a "Special Farm Package '10'" policy (the "Farm Policy"), under policy number 3401G2057, to Mr. Allen for the period of March 20, 2018 through March 20, 2019. (ECF No. 1-3). The Farm Policy covers residences and household contents, buildings, farm personal property, and scheduled personal property, as well as Farm Liability, Personal Liability, and/or Business Liability in Division V. (ECF No. 1-3 at 11).

The Farm Policy begins with a Schedule of Residences and Household Contents. Under Location #1, listed as 1577 Township Road 196 N.E., there are two farm residences listed. (ECF No. 1-3 at 4). The first has a limit of liability at $258,100 and the second at $182,878. (*Id.*). The contents of the first farm residence are also insured under this schedule. (*Id.*). The Farm Policy next includes a schedule of buildings and building contents. Now, there are two separate locations delineated by the Policy: 1577 Township Road 196 N.E. and 1355 Township Road 196 N.E., indicted as "Location #1" and "Location #2," respectively. (*Id.* at 6). Both 1577 and 1355 Township Road are insured premises under the policy. (ECF No. 1-3 at 10). Immediately below that, under "Optional Coverages," there is a category of "Residence Premises Rented to Others." (*Id.*). In this section appears 2018 Township Road 196 N.E., labeled as "Location #1." (*Id.*).

The Farm Policy defines "Insured" as follows:

23. INSURED

a. If the named INSURED on the coverage selection page is an individual, then INSURED means YOU, the named individual, EMPLOYEES while acting within the scope of their employment for YOU, and the following individuals who reside in a RESIDENCE where the named INSURED who is listed on the coverage selection page resides:

1) YOUR spouse;
2) relatives of YOU or YOUR spouse; and
3) persons under age twenty-one (21) in YOUR care or in the care of YOUR resident relatives.

(ECF No. 1-3 at 21). For policies where personal liability coverage has been purchased, the definition of Insured is the same. (*Id.* at 22). The policy does not define "reside."

The Farm Policy defines "Residence" as follows:

40. RESIDENCE means a one- to four- family dwelling or a one-family mobilehome, but does not include any part used for BUSINESS purposes.

(ECF No. 1-3 at 25). The policy does not define "dwelling."

In Division V, the Insurer provides coverage under Section A against property damage if a claim is made or a suit is brought against an insured for damages because of property damage caused by an occurrence to which the coverage applies. (ECF No. 1-3 at 85). Under the Farm Policy, coverage for property damages does not apply to "PROPERTY DAMAGE to property used by, rented to or in the care, custody or control of any INSURED or as to which an INSURED or his EMPLOYEES exercise physical control for any purpose." (ECF No. 1-3 at 87). The Farm Policy does provide coverage for "PROPERTY DAMAGE caused by fire, smoke or explosion to RESIDENCE PREMISES or furnishings for which YOU are legally liable and which are in YOUR care, custody or control." (*Id.*).

The Farm Policy also contains the following notice provisions. The policy requires the

insured to perform the following duties in case of an occurrence which could trigger liability coverage for property damage under the policy. (ECF No. 1-3 at 40). The Insured shall give written notice to the Insurer or agent as soon as possible, that sets forth the identity of both the policy and the Insured, reasonable available information "on the time, place and circumstances of the OCCURRENCE or offenses," as well as information on potential claimants and witnesses. (*Id.*). This section also requires the Insured to forward to the Insurer every notice, demand, summons or other process relating to the occurrence. (*Id.*). The Farm Policy notes that no action can be brought against the Insurer unless the Insured has fully complied with the policy provisions and the obligation of the Insured has been determined by final judgment or an agreement signed by the Insurer. (*Id.* at 41).

### b. *The Umbrella Policy*

During the same time period, ANPAC also issued Commercial Liability Umbrella Coverage (the "Umbrella Policy"), under policy number 3401B0308, to Mr. Allen. (ECF No. 1-4). The Umbrella Policy "contains many new coverages as well as enhancements to existing coverages." (ECF No. 1-4 at 10). The Umbrella Policy provides coverage for each covered occurrence up to $2,000,000.00 and with a $1,000.00 self-insured retention. (ECF No. 1-4 at 2). The Umbrella Policy provides that the Insurer would pay the ultimate net loss in excess of the retained limit to which the insurance applied for bodily injury or property damage. (ECF No. 1-4 at 23). The Umbrella Policy excludes coverage for property damage to property that the Insured owns, rents, or occupies. (ECF No. 1-4 at 26).

Section II of the Umbrella Policy sets forth who is considered an insured. When an individual is designated as the policy holder, the Umbrella Policy defines "Insured" as follows:

(1) An individual, you, the named individual, and the following residents of your household are insureds:

(a) your spouse;

(b) relatives of you and your spouse; and

(c) persons under age twenty-one (21) in your care or in the care of your resident relatives.

(ECF No. 1-4 at 64). The policy does not define "household."

The Umbrella Policy contains the following notice provisions. In the event of a covered occurrence, an Insured must "see to it that [the Insurer is] notified as soon as practicable of an 'occurrence' or an offense, regardless of the amount, which may result in a claim." (ECF No. 1-4 at 34). To the extent possible, the notice to the Insurer should include basic details about the occurrence, the names and addresses or any injured persons and witnesses, and the nature and location of any damage arising out of the occurrence. If a suit is brought against an Insured, the Insured should immediately record the specifics and notify the Insurer "as soon as practicable" in written form. (*Id.*). The Insured must also "immediately" send copies of any demands, notices, summonses, or legal papers, as well as authorize information and record access and generally cooperate with any investigations. (*Id.* at 34–35).

### 3. The Fire and Attendant State Court Proceedings

On August 9, 2018, Mr. Williamson was staying at a Days Inn in Reynoldsburg, Ohio operated by First Hotel, one of the Responding Defendants. (ECF No. 1-2 ¶ 4). While on the property, Mr. Williamson supposedly extinguished a cigarette in a mulch bed. (ECF No. 1-2 ¶ 5). At approximately 7:39 P.M. on August 9, 2018, a fire occurred at the Days Inn. (ECF No. 1-2 ¶ 6; ECF No. 39-1 at 1). The Ohio State Fire Marshal, Fire and Explosion Investigation Bureau ("FEIB") completed an incident report, which classified the fire as accidental and projected a loss amount of $1,000,000.00. (ECF No. 39-1 at 1). The building suffered extensive damage. (*Id.* at 4–5). The FEIB determined that the origin of the fire was the northernmost flower box on the property from an inappropriately discarded smoking material. (*Id.* at 5–6). The FEIB collected security

footage from the Days Inn. (*Id.* at 2). The DVR footage showed a male subject smoking and then discarding a cigarette in that flower box. (*Id.* at 6). Smoke was observed emanating from the flower box "a short time later" and increased in intensity over the next few hours. (*Id.*). Multiple hotel guests alerted the front desk clerk as to the smoking flower box, but he did not respond. (*Id.*). Smoke then entered the lobby of the hotel and the fire department was called. (*Id.*).

The Responding Defendants filed suit against Mr. Williamson in the Franklin County Court of Common Pleas in March 2019. (ECF No. 1-2). They sought $2.5 million in damages from Mr. Williamson under a theory of negligence. (ECF No. 1-2 ¶¶ 8–13). During this litigation, counsel for First Hotel subpoenaed Gary and Michelle Allen, and later Barry Peters Agency, LLC, for insurance information. (ECF Nos. 39-2, 39-3). In September 2019, counsel for First Hotel sent a letter to ANPAC and informed ANPAC that it understood Mr. Williamson to be covered by Mr. Allen's ANPAC policy as a "resident relative." (ECF No. 39-4). This letter also informed ANPAC of the ongoing litigation in Franklin County against Mr. Williamson relating to the hotel fire. (*Id.*). In November 2019, ANPAC responded to the letter after reviewing the Farm Policy and the Umbrella Policy. (ECF No. 39-5 at 1). ANPAC noted that Mr. Williamson had not tendered the lawsuit to ANPAC for coverage and informed the Responding Defendants of its conclusion that Mr. Williamson did not constitute an insured under either of the policies. (*Id.*).

### B. Procedural Background

ANPAC filed suit in January 2020, seeking a declaratory judgment that it has no obligation to provide coverage under the Policy to Defendant Williamson if he is found liable for the fire damage. (ECF No. 1). First Hotel Management, LLC and Halle's 5 Restaurants, LLC ("Responding Defendants"), the other two defendants named alongside Williamson in the Complaint, timely filed an answer and affirmative defenses to ANPAC's Complaint. (ECF No. 3).

After service was perfected against Mr. Williamson, ANPAC sought a default judgment against Mr. Williamson, who had failed to file a responsive pleading or answer. (ECF No. 28). This Court denied ANPAC's motion for default judgment as to Mr. Williamson without prejudice, as preferred Sixth Circuit practice in a multi-defendant case is for a court to withhold granting a default judgment until the trial of action on the merits against the remaining defendants. (ECF No. 35 at 3–4). Mr. Williamson remains in default and is no longer a participant in the litigation. (*Id.* at 6).

ANPAC filed its Motion for Summary Judgment on December 1, 2020, arguing that the undisputed material facts indicate that Mr. Williamson is not "insured" under the Policy and, as a result, that ANPAC is entitled to judgment as a matter of law on this issue of contract interpretation. (ECF No. 36 at 12–15). Even if Mr. Williamson is considered an "insured" under the Policy, ANPAC contends that his failure to timely notify ANPAC of the state court action against him precludes coverage under the Policy's terms. (*Id.* at 15–16). The Responding Defendants oppose ANPAC's Motion for Summary Judgment, arguing that the terms in the Policy are ambiguous and must be strictly construed against the insurer if they are reasonable susceptible to more than one interpretation. (ECF No. 39 at 16). The Responding Defendants submit that Mr. Williamson is covered by the Policy. (*Id.* at 23–26). They also counter ANPAC's assertions about late notice, as ANPAC received sufficient notice of the state court action such that it had time to investigate and litigate liability and coverage. (*Id.* at 26). The Responding Defendants also note that ANPAC has not argued that it is has suffered any tangible prejudice from the purported delay in notice. (*Id.*). ANPAC filed a reply in which it argues first that the Responding Defendants' interpretations of the Policy are illogical and against the plain meaning of the terms. (ECF No. 40). ANPAC also reiterates in its reply that, even if Mr. Williamson were covered by the Policy, he

failed to comply with its notice provisions such that coverage would be precluded. (*Id.*).

On Wednesday, May 5, 2021, this Court held oral argument on the Motion for Summary Judgment. This matter is now ripe for this Court's consideration.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *U.S. Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

On a motion for summary judgment, the initial burden rests upon the movant to present the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial

burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Self-serving affidavits alone, however, are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cnty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

In a contract dispute, summary judgment is appropriate when the contractual language is unambiguous, or, if the language is ambiguous, when extrinsic evidence leaves no genuine issue of material fact and permits interpretation of the agreement as a matter of law. *See Benzel v. Chesapeake Expl., L.L.C.*, No. 2:13-CV-00280, 2014 WL 4915566, at *3 (S.D. Ohio Sept. 30, 2014); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999). Stated otherwise, contract interpretation is turned over to the fact-finder only when the relevant contract language is ambiguous. *See Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law) (citing *Bahamas Agric. Indus., Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975)). The Court decides whether a contract is ambiguous as a matter of law. *Id.* (citing *D.L. Baker & Co. v. Acosta*, 720 F.

Supp. 615, 618 (N.D. Ohio 1989)).

## III.    LAW & ANALYSIS

### A.    Whether Mr. Williamson is "Insured" under the Policy

The primary issue in this case is whether Mr. Williamson is an "insured" under either the Farm Policy or the Umbrella Policy. Plaintiff ANPAC, who issued the policies, contends that Mr. Williamson cannot be considered an insured under either policy. Because Mr. Williamson has never resided with Mr. Allen, the policyholder, or resided in his household, ANPAC asserts that he does not fall within either plan's definition of "insured." (ECF No. 36). The Responding Defendants argues that the definition of insured in both the Farm Policy and the Umbrella Policy contains key words that are not otherwise defined by the policies and are susceptible to more than one reasonable interpretation. (ECF No. 39). They assert that any ambiguities must be construed against the insured, which in this case would lead to an interpretation of the term 'insured' that would encompass Mr. Williamson. (*Id.*). In its reply, Plaintiff characterizes the Responding Defendants' proposed readings of the policies as "illogical" and explain that the plain, common-sense meanings of the undefined terms must prevail. (ECF No. 40).

As an initial matter, both parties agree that Ohio law governs this matter. Under Ohio law, "[a] policy of insurance is a contract and like any other contract is to be given a reasonable construction in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." *Dealers Dairy Prods. Co. v. Royal Ins. Co.*, 164 N.E.2 745, 747 (Ohio 1960). Interpretation of written contract terms is a matter of law for initial determination by a court under Ohio law. *Potti*, 938 F.2d at 647 (citing *Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210, 1215 (Ohio Ct. App. 1988)). When determining the meaning of an insurance contract, "the contract should be read as a whole and each word given its

appropriate meaning, if possible." *Burdett Oxygen Co. of Cleveland v. Emps. Surplus Lines Ins. Co.*, 419 F.2d 247, 248 (6th Cir. 1969). Ambiguity exists "only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Potti*, 938 F.2d at 647 (citing *Wells v. Am. Elec. Power Co*., 548 N.E.2d 995 (Ohio Ct. App. 1988)).

## 1. Coverage under the Farm Policy

ANPAC maintains that Mr. Williamson does not fall within the Farm Policy's definition of "insured" because he has never resided with the policyholder, Mr. Allen, which the Responding Defendants dispute. The Farm Policy provides liability coverage to the named policyholder, as well as the relatives of the policyholder and his spouse "who reside in a RESIDENCE where the named INSURED . . . resides." (ECF No. 1-3 at 21). The policy defines residence as "a one- to four- family dwelling or a one-family mobilehome, but does not include any part used for BUSINESS purposes." (ECF No. 1-3 at 25). The policy does not separately define the terms "reside" or "dwelling." As the meaning of "dwelling" could be dispositive to this Court's analysis, this Court will consider this term first.

The Responding Defendants emphasize that the undefined policy term "dwelling" is susceptible to more than one meaning and, as such, it must be construed strictly against the insurance company and in favor of the insured. Responding Defendants note that dwelling can mean a house or structure within which people dwell or reside, or could mean a broader "place" where people dwell or reside. (ECF No. 39 at 17). Accordingly, "dwelling" could encompass either the Allen House or the more sprawling Allen Farm. (*Id.* at 17). The Responding Defendants report that no court in Ohio has yet to address this term, but cites to cases and statutes from other states in support of its broader reading of the term "dwelling" to mean a "place of residence," including

sometimes its "premises." (*Id.* at 17–18). The Responding Defendants also cite to this Court's decision in *Whittaker v. Allstate Property & Casualty Insurance Co.*, 2018 WL 6678362, at *3–4 (S.D. Ohio Dec. 18, 2018), for another principle of insurance policy interpretation: that when an ambiguity in such a document results from the choices of the insurer, the policy must be construed in the light most favorable to the insured. (*Id.* at 19). The Responding Defendants argue that "dwelling" must be interpreted more broadly, such that it includes both residences on the Allen Farm, which would make Mr. Williamson an "insured" within the terms of the policy even though he lives in a separate structure from Mr. Allen.

In its Reply, ANPAC notes that the Responding Defendants' reliance on *Whittaker* is misguided where an entity that is not a party to a contract seeks strict construction of its terms. (ECF No. 40 at 2). ANPAC also opposes the Responding Defendants' argument that "dwelling" could encompass what it characterizes as a "hodgepodge of building on separate plots of land owned by Mr. Allen, with at least two being used as separate households located at separate sides of a public street." (*Id.* at 2–3). ANPAC argues that the Responding Defendants' proffered definition of "dwelling" defies common sense and stands in contradiction to the usage of the term in Ohio's zoning laws, as discussed in *Bierlein v. Grandview Heights Board of Zoning Appeals*, 153 N.E.3d 817 (Ohio Ct. App. 2020). (*Id.* at 3–4). ANPAC also reasons that the plain and ordinary meaning of "reside," as explored by Ohio courts, shows there is no dispute of fact that Mr. Allen and Mr. Williamson did not reside together, such that Mr. Williamson cannot be considered an "insured" under the Farm Policy. (*Id.* at 4–5).

In interpreting an insurance policy, courts are to give words and phrases "their natural and commonly accepted meaning, where they in fact possess such meaning" such that a reasonable interpretation of the contract that is consistent with the "apparent object and plain intent of the

parties" can be reached. *See Sauer v. Crews*, 18 N.E.3d 410, 413 (Ohio 2014) (quoting *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982)). Where provisions of an insurance policy are clear and unambiguous, courts should not enlarge a contract "by implication in order to embrace an object distinct from that contemplated by the parties." *Gomolka*, 436 N.E.2d at 1348. Courts must examine the insurance policy as a whole to determine the parties' intentions, as well as to ascertain whether a word or phrase of the policy is ambiguous. *See Sauer*, 18 N.E.2d at 413. Under Ohio law, the absence of a definition in an insurance contract does not automatically render the term ambiguous. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). Only when a policy's language is ambiguous, such as that a provision is "susceptible of more than one reasonable interpretation," may a court liberally construe provisions in favor of the insured. *Sauer*, 18 N.E.3d at 413 (quoting *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)). This rule of construction will not apply if its application "would provide an unreasonable or forced interpretation" or "if it would result in an extension of coverage." *Messer v. Paul Revere Life Ins. Co.*, 884 F.2d 939, 940 (6th Cir. 1989).

For Mr. Williamson to be insured under the Farm Policy, he would need to be a family member of Mr. Allen who resides in a residence where Mr. Allen resides. (ECF No. 1-3 at 21). Incorporating the Farm Policy's chosen definition of residence, Mr. Williamson would need to be a family member of Mr. Allen who resides in a one- to four-family dwelling or a one-family mobilehome where Mr. Allen resides. It is an undisputed fact that Mr. Williamson is married to Mr. Allen's daughter, making them family members. ANPAC argues that under "any recognized definition of resident or reside," Mr. Williamson did not reside with Mr. Allen. (ECF No. 36 at 13). In turn, the Responding Defendants underscore that the Farm Policy does not define "dwelling" and that this term is capable of more than one reasonable interpretation, such that this

Court must liberally construe the definition of "Insured" in the policy to include Mr. Williamson. (ECF No. 39 at 18–19). ANPAC argues that interpreting "dwelling" in the manner proposed by the Responding Defendants would be implausible and not supported by any authority. (ECF No. 40 at 3).

Since "dwelling" is not defined by the Farm Policy, this term must be given its plain, dictionary definition. Many dictionaries define "dwelling" with reference to a physical structure, like a house or shelter. *See, e.g.*, Webster's Third New Int'l Dictionary 706 (1986) ("a building or construction used for residence; abode, habitation"); *Dwelling*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/dwelling (last visited May 5, 2021) ("a shelter (such as a house) in which people live"). Black's Law Dictionary employs this approach, defining "dwelling-house," which it notes is "[o]ften shortened to dwelling," as "[t]he house or other structure in which one or more people live; a residence or abode." *Dwelling-house*, *Black's Law Dictionary* (11th ed. 2019). Even a more abstract definition of dwelling, such as "a place to live in," evokes boundaries such as walls and a roof through the use of the preposition "in." *See, e.g.*, American Heritage Dictionary of the English Language 558 (5th ed. 2011) ("a place to live in; an abode"); *see also Dwelling*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/dwelling (last visited May 5, 2021) ("a house or place to live in"). The Supreme Court of Idaho has acknowledged these differences in interpretation, noting that "the more general 'place of residence' and the more definite 'house'" could both be reasonable definitions. *McFarland v. Liberty Ins. Corp.*, 434 P.3d 215, 222 (Idaho 2019).

These slight differences between definitions suggest that there is not a single, plain meaning of "dwelling," but rather that the term is ambiguous. Typically, Ohio law requires that

ambiguities in insurance policies be resolved in favor of the insured. *See Sauer*, 18 N.E.3d at 413. This principle is animated by the rationale that insurance policies are contracts of adhesion, where the terms are dictated exclusively by insurers. *See, e.g.*, *M&M Bar Corp. v. Northfield Ins. Co.*, 260 F. Supp. 3d 895, 899 (N.D Ohio 2017) (citing *Sekeres v. Arbaugh*, 508 N.E.2d 941 (Ohio 1987)). This principle of contract interpretation, however, is not applicable where an entity that is not a party to the insurance contract urges a court to interpret ambiguous policy terms strictly against an insurer. *See Felton v. Nationwide Mut. Fire Ins. Co.*, 839 N.E.2d 34, 37 (Ohio. Ct. App. 2005) (citing *Cook v. Kozell*, 199 N.E.2d 566 (Ohio 1964)) (characterizing proposition that a plaintiff who is not a party to a contract may not argue for strict construction as "well established"). Despite the ambiguity in the term "dwelling," this Court is not compelled to adopt a strict construction here where a party uninvolved in the contract seeks this result. Here, Mr. Allen, the policyholder, is not seeking coverage under the Policy which ANPAC is denying. Nor is Mr. Williamson, the purported insured, seeking for ANPAC to cover this incident. Instead, one insurance company is seeking a declaratory judgment to ensure that another insurance company cannot collect under Mr. Allen's policy. To strictly construe the provision here and ensure coverage by ANPAC may not necessarily resolve this matter "in favor" of Mr. Allen, who is not seeking for this incident to be covered.

This Court may thus proceed to determine how best to interpret "dwelling" within the Farm Policy using ordinary principles of contract interpretation. A term should not be read in isolation, but rather, a contract should be "read as a whole and each word given its appropriate meaning." *Whittaker v. Allstate Prop. & Ins. Co.*, No. 2:15-CV-02584, 2018 WL 6678362, at *3 (S.D. Ohio 2018); *see also Burdett Oxygen Co. of Cleveland v. Emps. Surplus Lines Ins. Co.*, 419 F.2d 247, 248 (6th Cir. 1969). Returning to the Farm Policy, an individual will be insured when a) he is

related to a named insured; b) he resides in a residence, defined as a one- to four-family dwelling or one family mobilehome; and c) the named insured resides in the same residence. (ECF No. 1-3 at 21). When the term "dwelling" is placed in this context, the less abstract definition of dwelling is the more reasonable interpretation. The provision contemplates that a dwelling is a place an individual will live "in," rather than a place an individual will live "at." A definition of dwelling that cabins it to a house or other structure in which people live is a more natural fit. *See also Dwelling-house; Dwelling; Usual place of abode*, *Garner's Dictionary of Legal Usage* 302–03 (3d ed. 2011) (noting that "dwelling" is frequently contrasted with the alternative "usual place of abode," the second of which would encompass some unhoused people). This is underscored by the Policy's decision to cover a single family mobilehome: if the Policy could cover a "place," it should presumably cover more than one mobilehome if located near one another and occupied by relative under Responding Defendants' expansive reading of dwelling. Yet the Farm Policy specifically defeats such a reading. Reading dwelling to be a single structure comports with the Farm Policy's reference to a single mobilehome. Additionally, this insurance policy was drafted in modern times where the concept of a "residence" more naturally brings to mind a single structure, rather than a sprawling estate with several buildings.

Mr. Allen has resided in his home at 1577 Township Road since 1975. This home is separated from the 1355 Township Road home by a public road. The two homes only came under common ownership in 2008 and sit on two different parcels of land. Both homes are listed as separate residences on the Farm Policy; if damage occurred to either home, this interpretation would not disturb any coverage of the house at 1355 Township Road. Instead, this Court's interpretation of "dwelling" as to the Farm Policy bears on whether Mr. Williamson receives personal liability coverage for his conduct *away* from the farm, at a hotel. These homes are not a

one- to four-family dwelling, as referenced in the Farm Policy. Rather, these homes are two separate one-family dwellings. As such, these homes cannot constitute a "residence" within the meaning of the Farm Policy, so it would be impossible for Mr. Williamson to reside in the same residence as Mr. Allen. Accordingly, Mr. Williamson is not insured under the terms of the Farm Policy.

### 2. Coverage Under the Umbrella Policy

The Responding Defendants also argue that Mr. Williamson is insured under the Umbrella Policy, which ANPAC also disputes. The Umbrella Policy provides liability coverage to the named policyholder and "the following residents of [the policyholder's] household": the policyholder's spouse, any relatives of the policyholder and his spouse, and any persons under age twenty-one (21) in the care of the policyholder or any of his "resident relatives." The Policy does not define "resident" or "household."

ANPAC argues that Mr. Williamson does not reside in Mr. Allen's "household" such that he is insured under the Umbrella Policy. ANPAC relies on the Sixth Circuit's interpretations of the term "household" to assert that the concept is limited to those who reside under the same roof or in the same home. (ECF No. 36 at 14). ANPAC then asserts that Ohio courts will inquire as to the consistency of the living arrangement in determining whether individuals reside in the same household. (*Id.*). If no facts establish a consistent residence with the insured at the same address, ANPAC argues that Ohio law does not consider them members of the same household. (*Id.* at 14–15). ANPAC also points this Court to an Ohio Court of Appeals decision, wherein that court found that an individual's son who lived on his parents' property did not reside within the same "household" as his parents and was therefore not insured under their policy. (*Id.* at 15 (citing *Waugh v. Akers*, No. 98 CA 21, 1999 Ohio App. LEXIS 220, at *12 (Ohio. Ct. App. Jan. 25,

1999)). ANPAC then argues that the undisputed facts show that Mr. Williamson and Mr. Allen never lived under the same roof or in the same home, so they are not residents of the same household for the purposes of the Umbrella Policy. (*Id.*). Accordingly, ANPAC requests summary judgment on this issue.

The Responding Defendants contend that Mr. Williamson is insured under the Umbrella Policy. First, they argue that the Umbrella Policy's "underlying insurance" clause provides coverage to Mr. Williamson because he is insured under the Farm Policy. (ECF No. 39 at 22–24). As this Court has just determined, Mr. Williamson is not insured under the Farm Policy and this argument is inapposite. Second, they argue that Mr. Williamson is also insured by the Umbrella Policy as a resident of Gary and Deborah Allen's household. (*Id.* at 24). The Responding Defendants cite to a decision by the Supreme Court of Ohio that defines a "household" as a "social unit comprised of those living together in the same dwelling place." (*Id.* (quoting *Shear v. W. Am. Ins. Co.*, 464 N.E.2d 545, 548 (Ohio 1984)). They note that the appellate courts of Ohio have unanimously accepted "'household' as 'under one roof,'" but urges this Court that those decisions were driven by whether a person could be said to "reside" in a place, not whether the place was under one roof. (*Id.* at 24–25). The Responding Defendants then urge this Court to follow decisions from other jurisdictions to answer the question of whether relatives residing in separate buildings can be characterized as a single household. (*Id.* at 25).

In reply, ANPAC emphasizes that Responding Defendants do not actually dispute the meaning of "household" under Ohio law. (ECF No. 40 at 5). ANPAC also reiterates that the Sixth Circuit, determining the definition of household under Ohio law, has already answered the question of whether relatives in separate buildings can be characterized as a single household and done so in the negative. (*Id.* at 5–6). ANPAC urges this Court to grant summary judgment in its favor on

the issue of whether Mr. Williamson is insured under the Umbrella Policy.

The Supreme Court of Ohio has resolved this question, as acknowledged by the Sixth Circuit. In *Shear v. West American Insurance Co.*, the Supreme Court of Ohio sought to ascertain the "common, ordinary, usual meaning" of "household." 464 N.E.2d 545, 548 (Ohio 1984). The *Shear* court then adopted the Webster's Third New International Dictionary definition, which defines household as "those who dwell under the same roof and compose a family: a social unit comprised of those living together in the same dwelling place." *Id.* The Sixth Circuit rejected a litigant's attempt to argue that the term "household" is ambiguous in light of the "well-developed Ohio case law" on the issue, including *Shear. See Flynn v. State Farm Mut. Auto., Ins. Co.*, 554 F. App'x 430, 434 (6th Cir. 2014); *see also Grange Ins. Co. v. Stubbs*, No. 11AP-163, 2011 WL 5185572, at *3 (Ohio Ct. App. Nov. 1, 2011) (noting that courts have applied the *Shear* definition of household for decades). Following *Shear*, at least one court has found that an adult child living on his parents' property in a trailer, where the home and trailer shared a mailbox, driveway, and yard, did not live primarily with his parents because they lived in separate structures. *See Waugh v. Akers*, No. 98 CA 21, 1999 WL 35542, at *1 (Ohio Ct. App. Jan. 25, 1999). While the policy at issue in *Waugh* did not use the term "household," the court found that whether the people dwelled under the same roof was also relevant to the question of whether they primarily lived together. *Id.* at *4; *see also Am. States Ins. Co. v. Guillermin*, 671 N.E.2d 317, 321–22 (Ohio Ct. App. 1996) (finding adult child who lived on farm owned by parents, but listed his address as his parents' home and visited on occasion, was not insured because they did not reside in the same household).

The Sixth Circuit in *Flynn* also noted that a household can include a family but is not limited to just family. *Id.* at 436. The Sixth Circuit was clear, however, that the definition of household required those individuals to live together in the same dwelling place. *Id.* To reside in

the same household, one must "live[] in the home of the named insured for a period of some duration or regularity, although not necessarily there permanently." *Flynn*, 554 F. App'x at 434 (quoting *Farmers Ins. of Columbus, Inc. v. Taylor*, 528 N.E.2d 968, 969 (Ohio 1987)). Temporary or transient visitors are excluded under this standard. *Id.* Other factors a court may consider include "the amount of time the person spends at the household, the person's age, the person's intent, and whether the insured is 'legally obligated' to the person." *Lowe v. Farmers Ins. of Columbus, Inc.*, No. 105558, 2017 WL 5036662, at *2 (Ohio. Ct. App. Nov. 2, 2017) (quoting *Wood v. McQueen*, No. 68472, 1995 WL 558925, at *6 (Ohio Ct. App. Sept. 21, 1995)). While a court may also consider further factors "including mail delivery and storage of belongings, and the layout and use of the residential dwelling," a court will be most concerned with the nontemporary nature or regularity of any living arrangements in making its determination. *Lowe*, 2017 WL 5036662, at *3 (quoting *Guillermin*, 671 N.E.2d at 321). Thus, this Court must consider the undisputed facts to determine whether Mr. Williamson and Mr. Allen ever dwelled under the same roof or lived together in the same dwelling place for a period of some duration or regularity.

The undisputed facts show that Mr. Williamson has never been a resident of Mr. Allen's household, let alone for some duration or regularity. Mr. Allen and Mr. Williamson have never lived under the same roof or together in the same dwelling place. Mr. Allen has lived in the house at 1577 Township Road since 1975. Mr. Williamson has never resided at 1577 Township Road, nor has he ever slept under the same roof as Mr. Allen. Mr. Williamson rarely visited the home at 1577 Township Road, did not possess a key to this home, and needed permission from Mr. Allen to visit. Likewise, Mr. Allen has never slept at 2018 Township Road, rarely entered the home, did not possess a key, and also needed permission to visit. While Mr. Allen owned the home at 2018 Township Road, this did not make him a resident of that household. Mr. Allen did handle trash

fees for both homes, but Mr. Williamson and his wife paid all other utilities for the property. The properties have separate mailing addresses and are located across a public road from one another. Mr. Allen has never resided in the same household as Mr. Allen, let alone with any regularity. Given these undisputed facts, Mr. Allen and Mr. Williamson are akin to neighbors, rather than a family living under one roof or as a social unit.

Ohio courts have considered far murkier factual scenarios than those before this Court and their analyses only strengthen this Court's conclusion. Minors who split their time between their divorced parents' homes have been found to have dual residence in both households for purposes of insurance, because they spent a significant amount of time in those places and kept belongings there. *See, e.g.*, *Willis v. Nationwide Ins. Co.*, No. 86-C-22, 1986 WL 14955, at *2 (Ohio App. Ct. Dec. 30, 1986). Where an adult child lived a "vagabond" lifestyle but listed her parents' residence as her home on all official documents, the Ohio Court of Appeals found there existed a genuine issue of material fact as to whether the daughter resides in her parents' household. *See McDaniel v. Daly*, No. 22453, 2008 WL 11921640, at *7 (Ohio. Ct. App. 2008); *see also State Farm Fire & Cas. Co. v. Davidson*, 621 N.E.2d 887, 892 (Ohio Ct. App. 1993) (finding relatives were not members of same household because "overnight visits were insufficiently permanent, long-term, or regular" even though one relative "enjoyed substantial privileges" at the other's home, such as receiving mail and storing belongings). Where a grandchild stayed in a home for at least one day a week or two weekends a month over five months, the grandchild could be considered a regular resident of the household. *Nationwide Ins. Co. v. Alli*, 896 N.E.2d 742, 747 (Ohio Ct. App. 2008). By contrast, where a named insured and adult child lived together in a home, but then the named insured moved out, courts have found they are no longer members of the same household. *See, e.g.*, *Minor v. Allstate Ins. Co., Inc.*, 675 N.E.2d 550, 554 (Ohio Ct. App. 1996).

Mr. Williamson and Mr. Allen, however, do not spend any time beyond visits or dinners at one another's house. They do not have belongings or a room at the other's home, nor have they ever been an overnight guest at the home of the other. Neither party has raised a genuine issue of material fact that bears on the duration and/or regularity of where Mr. Williamson and Mr. Allen dwelled. Even considering all of the evidence in favor of the nonmoving party, the undisputed testimony establishes that they each resided completely in their separate homes on Township Road.

### B. Whether Coverage is Precluded by the Notice Provisions

Because Mr. Williamson is not insured under either policy, the issue of whether coverage would be precluded by the notice provisions in each policy has been rendered **MOOT**.

### IV. CONCLUSION

For the reasons discussed above, Plaintiff ANPAC's Motion for Summary Judgment (ECF No. 36) is **GRANTED**. This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

DATE: July 1, 2021